UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JONATHAN RUSOFF, et al.,

Plaintiffs,

v.

THE HAPPY GROUP, INC.,

Defendant.

Case No. 21-cv-08084-AMO

**ORDER ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND DEFENDANT'S MOTION TO STRIKE OPINION OF CRAIG MORRIS**

Re: Dkt. Nos. 61, 72

This putative class action is about eggs, specifically, whether The Happy Group deceived consumers in California and New York about its Happy Eggs products being pasture raised. Now pending before the Court are Plaintiffs'[1] motion for class certification, ECF 61, and The Happy Group's motion to strike the opinion of Craig Morris, ECF 72.[2] Having carefully considered the parties' papers, the relevant legal authority, and the arguments advanced by counsel during the hearing on this matter, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motion for class certification and **GRANTS** The Happy Group's motion to strike.

I. **BACKGROUND**

A. **Factual Background**

The Happy Group manufactures and distributes eggs throughout the United States. ECF 41 ¶ 13. The egg products at issue here are sold as "Free Range Pasture Raised on Over 8 Acres" and "Organic Free Range Pasture Raised on Over 8 Acres" (the "Class Products"). ECF 61-2 ¶ 3;

---

[1] Jonathan Rusoff and Michael Merabi were the two original named plaintiffs. ECF 1. Joseph Gambino replaced Merabi as a named plaintiff upon the filing of the operative complaint. ECF 40 at 2; ECF 41 ¶ 10.

[2] The related administrative motion to seal, ECF 95, will be resolved by separate order.

ECF 62-2; ECF 62-3.  Plaintiffs refer to the statement appearing on the cartons for these products – "Pasture Raised on Over 8 Acres" – as the "Pasture Raised Claim."  ECF 61-2 at 8.

Plaintiffs contend that pasture raised "is the gold standard for eggs."  ECF 41 ¶ 23.  The hens producing "pasture raised eggs go outside, are exposed to sunlight and fresh air, and forage in fields," as required by animal welfare standards set by the American Humane Association and Human Farm Animal Care, which Plaintiffs allege are the industry standard.  *Id.* ¶¶ 18, 23.  In contrast, "free range hens do not regularly go outside, much less roam and forage for food in open fields.  They also consume feed that consists primarily of corn and/or soy."  *Id.* ¶ 22.  "Having exposure to sunlight and fresh air, eating a diet that includes seeds and insects, and being able to engage in natural behaviors, is foundational to the hens' happiness and wellbeing."  *Id.* ¶ 27.  These hens "produce higher quality eggs as a result."  *Id.*

Though The Happy Group's egg cartons "prominently bear the term 'pasture,' " Plaintiffs allege that the eggs "are not raised under conditions that comport with the meaning of the term."  *Id.* ¶ 30.  According to Plaintiffs, The Happy Group's hens "are only afforded average daytime access to an outdoor area of approximately 21.8 square feet per hen . . . well short of the 108.9 square feet per hen of outdoor space that must be provided in order to make a pasture raised claim."  *Id.* ¶ 34.  The Happy Group "does not provide its hens with access to live vegetation, nor does it provide year-round outdoor access, in compliance with the pasture raised standard."  *Id.*  It also provides 0.5 acres per 1,000 hens, less than the 2.5 acres per 1,000 hens required under the pasture raised standard."  *Id.*  Still, The Happy Group "systematically use[s] the well-known 'pasture' terminology," and sells its eggs at the premium price the market commands for those that are pasture raised.  *Id.* ¶¶ 29, 30.

Based on The Happy Group's representations on their egg cartons, Plaintiffs formed a reasonable belief that "were buying and eating eggs from hens that were raised according to the highest standards of life and health for hens – i.e., that they were buying and eating pasture raised eggs."  *Id.* ¶¶ 8-10.  This belief was an important part of the decision to purchase The Happy Group's eggs.  *Id.* ¶¶ 8-10.  Plaintiffs "would have not have purchased the eggs" or "would have paid less for them" if they had known the eggs were not pasture raised.  *Id.* ¶¶ 8-10.  Because of

The Happy Group's misleading, false, unfair, and deceptive practices, Plaintiffs paid a price premium for eggs that were not pasture raised. *Id.* ¶¶ 8-10.

### B.    Procedural Background

Plaintiffs commenced this proposed class action on October 15, 2021.  ECF 1.  They filed the operative fourth amended complaint on August 8, 2022, asserting claims for violations of (1) the California Consumer Legal Remedies Act, Cal. Civil Code § 1750, *et seq.*, (the "CLRA"), (2) California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*, (the "FAL"), (3) the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*, (the "UCL") (4) New York General Business Law ("GBL") § 349, (5) New York GBL § 350, (6) breach of express warranty under California Commercial Code § 2313, (7) breach of express warranty under New York U.C.C. § 2-313, (8) breach of implied warranty under California Commercial Code § 2314, [3] and (9) and intentional misrepresentation.  *Id.* ¶¶ 65-69, ¶¶ 70-76, ¶¶ 77-85, ¶¶ 86-96, ¶¶ 97-105, ¶¶ 106-115, ¶¶ 116-122, ¶¶ 123-129.

Plaintiffs filed their motion for class certification on April 11, 2023.  ECF 61.  The Happy Group filed its opposition to the motion on June 9, 2023, with a motion to strike the expert opinion of Craig Morris.  ECF 71, 72.  Plaintiffs filed a reply in support of their motion for class certification and an opposition to the motion to strike on July 21, 2023.  ECF 77, 79.  The Happy Group filed its reply in support of the motion to strike on August 11, 2023.  ECF 83.  Following guidance from the Court, the parties resolved some evidentiary objections and reached agreement on limited additional briefing.  ECF 81, 82, 85, 86, 87.  Following that further briefing, the Court held a hearing on the pending motions on October 5, 2023.  ECF 86, 89.

## II.    DISCUSSION

Because Plaintiffs rely on the opinions of their expert, Craig Morris, to meet the class certification requirements, the Court first addresses The Happy Group's motion to strike those

---

[3] Plaintiffs do not seek certification of their California breach of implied warranty claim and state they "can file an amended complaint omitting this claim with the Court's leave."  ECF 61-1 at 18. The parties shall meet and confer on whether they can reach a stipulation on this issue to avoid unnecessary motion practice.

United States District Court
Northern District of California

1    opinions before turning to Plaintiffs' motion for class certification.

2    **A.    Motion to Strike**

3    Federal Rule of Evidence 702 permits "[a] witness who is qualified as an expert by

4    knowledge, skill, experience, training, or education" to "testify in the form of an opinion or

5    otherwise" where:

> (a) the expert's scientific, technical, or other specialized knowledge
> will help the trier of fact to understand the evidence or to determine
> a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods;
> and
> (d) the expert has reliably applied the principles and methods to the
> facts of the case.

11    Fed. R. Evid. 702.

12    "In evaluating challenged expert testimony in support of class certification, a district court

13    should evaluate admissibility under the standard set forth in *Daubert*[4]." *Grodzitsky v. Am. Honda*

14    *Motor Co.*, 957 F.3d 979, 984 (9th Cir. 2020) (internal citations, quotations, and modifications

15    omitted). Under *Daubert*, expert testimony is admissible if it is both relevant and reliable.

16    *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017). Expert testimony is

17    relevant if it "will assist the trier of fact to understand or determine a fact in issue." *Cooper v.*

18    *Brown*, 510 F.3d 870, 942 (9th Cir. 2007) (citing *Daubert*, 509 U.S. at 591-92). "The evidence

19    must logically advance a material aspect of the party's case." *Id.* (citation omitted). Expert

20    testimony "is reliable if the knowledge underlying it has a reliable basis in the knowledge and

21    experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010)

22    (footnote omitted).

23    At class certification, "the relevant inquiry is a tailored *Daubert* analysis which scrutinizes

24    the reliability of the expert testimony in light of the criteria for class certification and the current

25    state of the evidence." *Id.* The inquiry, therefore, does not end at admissibility. *Sali v. Corona*

26    *Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018). "[E]ven if the evidence is admissible, the

27

28    _____

4 *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

United States District Court
Northern District of California

United States District Court
Northern District of California

1   district court must then evaluate its persuasiveness during the class certification analysis." *See*

2   *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).

3       The Happy Group moves to strike the opinion of Plaintiffs' proposed expert Craig Morris,

4   Ph.D. [5]  ECF 72.  The core of Dr. Morris's opinion is that:

> [T]he free-range and pasture-raised standards promulgated
> by the AHA and HFAC are predominantly used and followed in the
> egg industry.  In the absence of federal regulation, they are the
> industry standard.  Accordingly, prevailing consumer expectation is
> that an egg producer using the free-range or pasture-raised claim is
> adhering to the commonly accepted standards pertaining to such
> claims, as set by the AHA and/or HFAC.  Therefore, if an egg
> producer makes a free-range or pasture-raised claim, it should be
> consistent with at least one of these standards, or if not, prominently
> disclose that it is following a different standard or explain the basis
> for the free-range or pasture-raised claim.
>
> This is true even if the average consumer is not familiar with
> the details of these standards, because the onus is on the company to
> comply with prevailing standards.  A consumer certainly would not
> be expected to know the details or nuances of a particular standard
> (for example, the beef tenderness standard I referenced above), but if
> the standard is not met, it would be false and deceptive for a
> company to make such a claim.  It is no different here.  Marketing to
> consumers that eggs are pasture raised without a disclosure making
> clear that the eggs do not comply with industry standards is false
> and inherently misleading.

17  ECF 62-66 ¶¶ 44-45.

18      The Happy Group argues that Dr. Morris lacks the scientific, technical, or other specialized

19  knowledge required to opine on standards in the egg industry.  ECF 72 at 4-7.  It also contends

20  that Dr. Morris's opinions are neither based on sufficient facts or data nor the product of reliable

21  principles or methods.  *Id.*  The Court first addresses Dr. Morris's qualifications before turning to

22

23  ───────────────

24  [5] Although Plaintiffs cite to the Court's Standing Order, *see* ECF 79 at 19, Dr. Morris's reports do
    not comply with the requirement that "[a]ll expert reports shall number each paragraph to facilitate
25  any motion practice challenging the specifics of any opinions and shall include a table of
    contents[,]" and "shall list each opinion to be proffered and provide an executive opinion of each."
26  *See* Standing Order for Civil Cases at 6 (May 10, 2023), amended (Nov. 22, 2023).  The motion to
    strike also does not comply with the Court's Standing Order, which requires that such motions
27  "clearly specify the paragraphs or portions of the report that the party seeks to exclude."  *See id.*
    Future non-compliant submissions will be stricken.  Moreover, to the extent the parties have
28  buried requests for relief that should have been brought as separately-noticed motions, *see* ECF 83
    at 3 (seeking to strike improper deposition transcript errata and rebuttal declaration), the Court has
    disregarded those requests and related arguments here.

the reliability of his methodology.

### 1.    Qualifications

Dr. Morris's experience in food and agriculture marketing and regulation spans over 30 years.  *See* ECF 62-66 ¶¶ 9-18, 43.  He obtained a Doctorate in Animal Science in 1995 and has served as an outside expert and consultant in agricultural commodity marketing throughout his career.  *Id.* ¶¶ 9, 10.  He has also held various positions in different organizations within the industry, including serving as the Deputy Administrator for the U.S. Department of Agriculture, Agricultural Marketing Service ("AMS") Livestock, Poultry and Seed Program, Vice President of International Marketing for the National Pork Board, and currently, as the Chief Executive Officer of the Association of Genuine Alaska Pollock Producers.  *Id.* ¶¶ 11-13.

During his time at AMS, a significant portion of Dr. Morris's work included "developing national and international standards for various agricultural commodities."  *Id.* ¶ 14.  Dr. Morris also chaired the U.S. representation and served "as an author of the International Organization for Standardization's (ISO) first-ever standard for the welfare of food producing animals."  *Id.* ¶ 15. He led "the U.S. representation to the United Nation's Economic Commission for Europe's Meat Standardization Section that developed the United Nation's first meat, poultry, egg and fish quality standards that defined claims used in the marketing of these products."  *Id.* ¶ 16.

While "experts are not required to have previous experience with the product at issue[,]" *see In re Macbook Keyboard Litig.*, No. 5:18-CV-02813-EJD, 2021 WL 1250378, at *6 (N.D. Cal. Apr. 5, 2021), Dr. Morris has done work involving egg products.  He has "had oversight responsibility for the commodity marketing boards, including the American Egg Board and its marketing programs related to eggs and egg products."  *Id.* ¶ 15.  In that role, Dr. Morris "was intimately connected to commodity reporting and grading operations, including those for eggs," giving him experience "in the basis of agency approval of marketing claims associated with shell eggs."  *Id.*  Dr. Morris also gained knowledge and familiarity with "commonly accepted standards and practices regarding egg laying hens" through "interviews and conversations with leading egg experts, including the Pacific Egg and Poultry Association, Egg Quality Program of the California Department of Food and Agriculture, the U.S. Department of Agriculture, and the

American Egg Board and United Egg Producers," which have taken place over the course of his career.  *Id.* ¶ 18.

Given Dr. Morris's extensive qualifications in his field, the Court finds that he possesses "at least the *minimal foundation* of knowledge, skill, and experience required in order to give expert testimony."  *See Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (internal quotations and citation omitted; modifications in original); *Rogers v. Raymark Indus. Inc.*, 922 F.2d 1426, 1429 (9th Cir. 1991) ("A witness can qualify as an expert through practical experience in a particular field[.]").  The Court rejects The Happy Group's contention that Dr. Morris lacks the specific expertise needed to opine on eggs standards.[6]  *See In re Silicone Gel Breast Implants Prod. Liab. Litig.*, 318 F. Supp. 2d 879, 889 (C.D. Cal. 2004) ("A court abuses its discretion when it excludes expert testimony solely on the ground that the witness's qualifications are not sufficiently specific if the witness is generally qualified.  A lack of specialization affects the weight of the expert's testimony, not its admissibility.") (citation omitted); *see also In re PFA Ins. Mktg. Litig.,* No. 4:18-CV-03771 YGR, 2021 WL 5994908, at *4 (N.D. Cal. Nov. 3, 2021) (rejecting argument that proffered expert with decades of experience in the life insurance industry could not offer expert testimony without specialization in indexed universal life policies or compliance issues); *In re Macbook Keyboard Litig.*, 2021 WL 1250378, at *6 (holding expert did not need specific experience with keyboards given indisputable experience in materials science, mechanical engineering, and failure analysis).

### 2.    Reliability

In forming his opinions on industry standards and consumer perception, Dr. Morris reviewed the operative complaint and The Happy Group's answer, documents produced by The Happy Group in discovery, deposition transcripts, and drew upon his extensive experience, including that "in standards development for the purpose of label claims from [his] time at the U.S. Department of Agriculture."  ECF 62-66 ¶¶ 19, 23-31 & nn.8-15; ECF 77-13 ¶ 18.  He

---

[6] During oral argument, The Happy Group confirmed that it makes no challenge to Dr. Morris's qualifications to opine on consumer expectations, taking the position that such a challenge is unnecessary given that Dr. Morris's opinions on consumer expectations are mere ipse dixit.

United States District Court
Northern District of California

consulted international animal welfare draft standards pertaining to poultry and egg-laying hens that "speak to welfare overall and are those overarching welfare standards most often adhere to or incorporate guidance from commonly-accepted industry standards and practices." ECF 62-66 ¶ 19. He conducted online research, visited grocery stores "in or around [his] neighborhood," and took pictures of different egg products bearing a pasture raised label. *Id.* ¶ 34. Dr. Morris's initial report states:

> To be clear, this is not intended to be a comprehensive survey of all egg brands in the market, although I could conduct such a survey or retain someone to do one for me. That said, I believe this presents a telling snapshot of the market, particularly from the perspective of a typical consumer shopping for eggs at the grocery store.

*Id.* ¶ 35.

Dr. Morris testified that there was no methodology for taking pictures of cartons in stores, no scientific basis for the days he chose to visit those stores, and only selected cartons if they made a pasture-raised claim. ECF 74-3 at 13-14. In the context of answering questions about his process for visiting local grocery stores, when asked if he intended "this to be like a scientific process," Dr. Morris replied, "[a]bsolutely not." *Id.* at 9. He explained:

> It's what I do as a part of my day job with Genuine Alaska Pollock Producers. We do a number of very scientifically designed studies that are surveys. This was intended to be a survey for my own personal purposes, but not a nationally representative sample.

*Id.* Dr. Morris added that he did not intend for his work to be representative of California or New York. *Id.* at 9-10.

What suffices for Dr. Morris's personal purposes does not satisfy *Daubert*. While "the test of reliability is 'flexible,' " the objective of Daubert's gatekeeping requirement "[i]t is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 152 (1999). Dr. Morris's own deposition testimony shows that is not the case here. When asked what kind of surveys he did for work, Dr. Morris responded:

///

United States District Court
Northern District of California

1

2

3

4

> Awareness, perception. . . .  A whole host of issues.  What it is, intent to buy over the next 30 days.  We do focus groups related to the attributes that are most likely to create evangelists or drive demand.  We have a -- we spend millions of dollars on research that are all designed for different purposes, both domestically and abroad.

5   *Id.* at 10.  When asked, "[i]f you had been asked to run a survey to see what consumers think

6   pasture raised means, are you competent to design and have that survey run," Dr. Morris

7   responded:  "I'm confident that I could identify an agency to help do that work on my behalf.  I

8   know what I'm looking for in the survey.  I'm not a survey expert."  *Id.*  Dr. Morris confirmed that

9   he did not interview any consumers.  *Id.* at 18.  The methodology Dr. Morris used to reach his

10   opinion that on consumer expectations thus does not pass the standards that he would expect of his

11   own survey consultant.  The statement in Dr. Morris's rebuttal declaration that he applied the

12   methodology that "any expert in [his] field would undertake," ECF 77-13 ¶¶ 15, 18, cannot be

13   squared with the sworn deposition testimony discussed above.[7]  Dr. Morris's own testimony is that

14   such a study would be required.

15          Plaintiffs attempt to salvage Dr. Morris's methodology by (1) arguing that The Happy

16   Group's expert – Dr. Joy Mench – used the same methods, and (2) pointing to two writings

17   outside of the class period that purportedly confirm his conclusions.  ECF 79 at 10-12.  Both

18   arguments fail.

19          As to Plaintiffs' first argument, Defendants dispute that Dr. Mench applied the same

20   methods as Dr. Morris.  ECF 83 at 9-10.  Whether their methodologies align or not, Dr. Morris's

21   deposition testimony illustrates that, in his own knowledge and experience, he would expect a

22   more rigorous analysis than what he has conducted.  That is enough to grant The Happy Group's

23   motion.  *Compare Stiner v. Brookdale Senior Living, Inc.*, No. 17-CV-03962-HSG, 2023 WL

24   2722294, at *6 (N.D. Cal. Mar. 30, 2023) (rejecting argument that expert opinion should be

25

26   _____

27   [7] Indeed, Plaintiffs offer an entirely separate expert – Dr. J. Michael Dennis – to offer survey evidence on consumer deception and materiality, ECF 61-88, and in a footnote, Plaintiffs indicate "[i]f the Court believes [Dr. Morris's consumer expectations] opinion is unnecessary, it could refrain from ruling on it, or it could strike only this portion of Morris's opinion."  ECF 79 at 14 n.4.

28

1    excluded for lack of a reliable scientific process where expert's opinions were adequately based on

2    extensive personal knowledge and experience).

3         As to Plaintiffs' second argument, they rely on a blog post and a letter.  ECF 83 at 11-12.

4    The June 15, 2023 blog post, made by a trade organization called United Egg Producers stated, in

5    part:

6              Egg producers commonly differentiate free-range and pasture-raised
               in the layer industry through established non-governmental
7              certifications.  Though the two most popular certifications for these
               claims do not match precisely, they have provided stability for the
8              industry and ensured that on-label raising claims related to free-
               range and pasture production methods meet established standards.
9              These certifications already ensure that free-range and pasture are
               neither interchangeable nor misleading in eggs and include
10             vegetation requirements.  As the agency continues investigating
               these animal-raising claims, third-party certification programs must
11             be part of any claims made.

12   ECF 77-6 at 2.  The May 2023 letter from another organization – the United Egg Association – to

13   the U.S. Department of Agriculture's Food and Safety Inspection Service, the United Egg

14   Association stated, in part:

15             Egg producers commonly differentiate free-range vs. pasture in the
               layer industry through established non-governmental certification
16             schemes.  Though the two most popular certifications do not match
               precisely (*see comparison table below*), they have provided stability
17             for the industry and ensure that on-label raising claims related to
               free range and pasture production methods meet established
18             standards.  Importantly, these certifications already ensure that free-
               range and pasture are neither interchangeable nor misleading in eggs
19             and do not have vegetation requirements.

20   ECF 77-5 at 3 (emphasis in original).  The referenced table is reproduced below:

21
     | Certifying Body | Egg Free Range | Egg Pasture Raised |
22   | --- | --- | --- |
     | Certified Humane Farm Animal Care | 2.0 sq. ft. / bird | 108.0 sq. ft. / bird |
     | American Humane Certified | 21.8 sq. ft. / bird | 108.8 sq. ft. / bird |
23

24   *Id.*  Plaintiffs contend that this blog post and letter, combined with certain excerpts from the

25   deposition of The Happy Group's own expert, Dr. Mench, is dispositive of whether AHA/HFAC

26   standards are the industry standard and that the Court can thus deny the instant motion as moot on

27   that basis alone.  ECF 79 at 12.  Even if Plaintiffs' reading of these materials were correct, the fact

28   that they may confirm Dr. Morris's conclusions is separate from the question of whether he

United States District Court
Northern District of California

1    arrived at those conclusions in a manner that passes muster under *Daubert*.  *See Primiano*, 598

2    F.3d at 564 ("[T]he test under *Daubert* is not the correctness of the expert's conclusions but the

3    soundness of his methodology.").  Here, Plaintiffs have not shown that Dr. Morris's opinions are

4    sufficiently reliable.  The Court therefore excludes his consumer expectations and industry

5    standards opinions on this basis.  Consequently, the Court has not considered those opinions in

6    deciding Plaintiffs' motion for class certification, to which the Court now turns.

7         **B.    Motion for Class Certification**

8         "Rule 23 of the Federal Rules of Civil Procedure governs class certification."  *White v.*

9    *Symetra Assigned Benefits Serv. Co.*, 104 F.4th 1182, 1191 (9th Cir. 2024).  The rule "mandates

10   that district courts 'rigorous[ly] analy[ze]' whether a proposed class meets various requirements."

11   *Black Lives Matter Los Angeles v. City of Los Angeles*, 113 F.4th 1249, 1258 (9th Cir. 2024)

12   (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)) (modifications in original).  "[A]

13   class action may be maintained if the four prerequisites of Rule 23(a) are met, and the action meets

14   one of the three kinds of actions listed in Rule 23(b)."  *Van v. LLR, Inc.*, 61 F.4th 1053, 1062 (9th

15   Cir. 2023).  Rule 23(a) requires a showing that:

16              (1) the class is so numerous that joinder of all members is
                impracticable;
17              (2) there are questions of law or fact common to the class;
                (3) the claims or defenses of the representative parties are typical of
18              the claims or defenses of the class; and
                (4) the representative parties will fairly and adequately protect the
19              interests of the class.

20   Fed. R. Civ. P. 23(a).  Among the actions listed in Rule 23(b) are those in which "questions of law

21   or fact common to class members predominate over any questions affecting only individual

22   members, and . . . a class action is superior to other available methods for fairly and efficiently

23   adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3); *see Lytle v. Nutramax Labs., Inc.*, ---

24   F.4th ----, ----, 2024 WL 3915361, at *5 (9th Cir. Aug. 23, 2024).

25         The class certification analysis "may entail some overlap with the merits of the plaintiff's

26   underlying claim," but "Rule 23 grants courts no license to engage in free-ranging merits inquiries

27   at the certification stage."  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 465-66

28   (2013) (internal quotations and citations omitted).  "Merits questions may be considered to the

United States District Court
Northern District of California

extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* To that end, "the plaintiffs must 'affirmatively demonstrate' by a preponderance of actual evidence that they satisfy all the Rule 23 prerequisites." *Black Lives Matter*, 113 F.4th at, at 1258 (citing *White*, 104 F.4th at 1192). They " 'must actually *prove* – not simply plead – that their proposed class satisfies each requirement of Rule 23.' " *Id.* (citing *White*, 104 F.4th at 1192) (emphasis in original).

Plaintiffs seek certification of the following classes pursuant to Rule 23(b)(3):

> <u>California Class</u>:  All natural persons who purchased at least one carton of The Happy Group, Inc.'s eggs at a retail store in California, at any time from May 1, 2019 to December 31, 2021, with a carton that stated "Pasture Raised on Over 8 Acres."

> <u>New York Class</u>:  All natural persons who purchased at least one carton of The Happy Group, Inc.'s eggs at a retail store in New York, at any time from May 1, 2019 to December 31, 2021, with a carton that stated "Pasture Raised on Over 8 Acres."

ECF 62-1 at 19.

The Happy Group argues that class certification should be denied because Plaintiffs cannot meet Rule 23(a)(3)'s typicality requirement, Rule 23(a)(2)'s commonality requirement, or Rule 23(b)(3)'s predominance requirement. ECF 70-3 at 18. The Happy Group does not challenge numerosity or adequacy, *see id.* at 17 n.13, or, as confirmed at the hearing, superiority. Because Plaintiffs must meet all of Rule 23's requirements, the Court briefly addresses the Rule 23 requirements that are not in dispute before turning to those that are contested.

### 1.    Numerosity

Rule 23(a)(1) requires that the class be so numerous that joinder of all members individually is impracticable. Fed. R. Civ. P. 23(a)(1). "Although there is no exact number, some courts have held that numerosity may be presumed when the class comprises forty or more members." *Vizcarra v. Unilever United States, Inc.*, 339 F.R.D. 530, 543 (N.D. Cal. 2021) (internal quotations and citation omitted). Here, Plaintiffs offer The Happy Group's responses to requests for admission, indicating that The Happy Group's eggs have been sold to over 100 consumers in both California and New York. ECF 62-1 at 19; ECF 61-67 at 5-6. Each proposed class is thus sufficiently numerous.

### 2.    Adequacy

Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "This requires inquiry into whether the plaintiff and its counsel have any conflicts of interest with other class members, and whether the plaintiff and its counsel will prosecute the action vigorously on behalf of the class." *Vizcarra*, 339 F.R.D. at 550 (citing *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003)).

Plaintiffs' declarations state that their interests are aligned with the interests of the class members and that they are aware of no conflicts of interest. ECF 62-1 at 21; ECF 61-85 ¶ 9; ECF 61-86 ¶ 9. They have actively participated in the litigation by sitting for deposition and responding to written discovery, and they are committed to fulfilling their obligations as class representatives. ECF 62-1 at 21; ECF 61-85 ¶¶ 9-10; ECF 61-86 ¶¶ 9-10. Plaintiffs' counsel submit that they are experienced in litigating complex class actions, have dedicated resources to litigating this case on behalf of Plaintiffs and class members, and will continue to do so through trial and appeals. ECF 62-1 at 21; ECF 61-2 ¶¶ 4-20; ECF 61-84 ¶¶ 4-10. Based on the declarations provided, the Court finds that each Plaintiff, and their counsel, satisfy Rule 23(a)(4)'s adequacy requirement.

### 3.    Superiority

Class certification under Rule 23(b)(3) requires a showing that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In deciding whether the superiority requirement is met, courts consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

*Id.* "Where classwide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1235 (9th Cir. 1996).

Plaintiffs argue that proceeding on a class basis is superior to other methods of

adjudication for four reasons. ECF 62-1 at 31. First, each class member's damages are modest compared to the time and expense of litigating their claims. *Id.* Second, "it does not appear" that any class member has commenced litigation concerning the subject matter of this litigation. *Id.* Third, litigating the claims asserted in a single proceeding is desirable because "individual claims could only be brought by consumers unlikely to be able to afford to pursue them or who lack sufficient knowledge of their rights." *Id.* Fourth, because the claims at issue rise and fall on common evidence, adjudication on a class basis will reduce litigation costs and promote greater efficiency. *Id.* Plaintiffs' arguments are well-taken. In line with other courts that have found superiority satisfied in comparable class cases, this Court finds that Plaintiffs meet that requirement here. *See, e.g.*, *Bailey v. Rite Aid Corp.*, 338 F.R.D. 390, 411 (N.D. Cal. 2021); *Prescott v. Reckitt Benckiser LLC*, No. 20-cv-02101-BLF, 2022 WL 3018145, at *13 (N.D. Cal. July 29, 2022).

### 4. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The test for typicality is 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.' " *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 562 n.4 (N.D. Cal. 2020) (quoting *Ellis*, 657 F.3d at 984). "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Hanon v. Dataprods. Corp.*, 976 F.2d 497, 509 (9th Cir. 1992)). "Typicality may be lacking if there is a danger that absent class members will suffer [because] their representative is preoccupied with defenses unique to it." *Vizcarra*, 339 F.R.D. at 550 (citation and internal quotations omitted; modification in original).

The Happy Group argues that Plaintiffs fail the typicality requirement because they are "vulnerable to 'unique defenses' that are likely to 'become the focus of the litigation.' " ECF 70-3 at 30 (quoting *Hanon*, 976 F.2d at 509). In support of this argument, The Happy Group points to deposition testimony from each Plaintiff. As to Plaintiff Rusoff, The Happy Group cites

14

testimony indicating that "(1) he has no understanding of the AHA's or HFAC's requirements for their pasture raised certifications," "(2) he believes that cartons that do not have a certified logo are not certified," and (3) "the Whole Foods standard for pasture raised is fine." ECF 70-3 at 30. As to Plaintiff Gambino, The Happy Group points to his testimony that (1) egg producers do not all use pasture raised to mean the same thing, (2) he did not see anything on Happy Egg's cartons that made him think they are AHA-certified, and (3) after seeing a video of Happy Egg's farms, he would consider eggs from such a farm to be pasture raised. *Id.* The Happy Group also highlights that Plaintiff Gambino claims he purchased eggs at a Whole Foods in New York, where the company has never sold its eggs. *Id.*

However, The Happy Group does not identify a single specific defense that would be unique to either Plaintiff. *See Smith v. Keurig Green Mountain, Inc.*, No. 18-CV-06690-HSG, 2020 WL 5630051, at *3 (N.D. Cal. Sept. 21, 2020) (concluding that assertions that plaintiff had not read recycling label on product, did not know whether local recycling facility could recycle product, and could not claim to have been deceived in any way did not establish unique defenses). Similarly, The Happy Group has not advanced any argument as to how any claimed unique defense would become the focus of this litigation, and its current challenge to typicality does not resemble any of the successful ones cited.

In *Hanon*, a securities case, the district court denied the plaintiff's motion for class certification. 976 F.2d at 509. On appeal, the Ninth Circuit affirmed. *Id.* It found typicality lacking because "of [plaintiff's] extensive experience in prior securities litigation, his relationship with his lawyers, his practice of buying a minimal number shares of stock in various companies, and his uneconomical purchase of only ten shares of stock in" the defendant corporation. *Id.* at 508. That plaintiff's "unique background and factual situation require[d] him to prepare to meet defenses that are not typical of the defenses which may be raised against other members of the proposed class." *Id.* No similar facts exist here.

In *Benedict v. Hewlett-Packard Company*, a misclassification case, the district court found that one of the named plaintiffs did not meet the typicality requirement. 314 F.R.D. 457, 471 (N.D. Cal. 2016). That plaintiff testified that "he intended to sign [a] waiver agreement, c[ould]

United States District Court
Northern District of California

1  not think of a reason why he did not sign, and received payment for signing it, but also c[ould] not

2  recall actually signing it." *Id.* at 471.  Though the defendant had not located the signed waiver

3  agreement, the Court found sufficient evidence to conclude that the plaintiff could become

4  preoccupied with the defenses unique to him.  *Id.*  Not so here.

5  In *Bowling v. Johnson & Johnson*, a mislabeling case, the defendants presented unrebutted

6  evidence that the named plaintiff could not have purchased the product at issue in the manner

7  described in her testimony.  No. 17-CV-3982 (AJN), 2019 WL 1760162, at *6 (S.D.N.Y. Apr. 22,

8  2019).  The court did "not reach a conclusion . . . that [plaintiff] testified falsely," but it did find

9  "sufficient justification for the conclusion that she would not be an adequate class representative in

10  light of the substantial credibility issues that threaten[ed] to undermine her claims." *Id.*  The

11  Happy Group has offered nothing like this.

12  Here, Plaintiffs purchased the same products – bearing the statement "Pasture Raised on

13  Over 8 Acres" on the carton – as the proposed class members, thinking they were buying pasture

14  raised eggs.  ECF 61-85 ¶ 4; ECF 61-86 ¶ 4.  Plaintiffs assert the same claims on behalf of

15  themselves as they do on behalf of the class members, and they will consider their own interests

16  along with those of the class members.  ECF 61-85 ¶¶ 7, 9; ECF 61-86 ¶¶ 7, 9; *see also* ECF 41.

17  This is sufficient to meet Rule 23(a)(3)'s "permissive standards" for typicality.  *See Lilly v. Jamba*

18  *Juice Co.*, 308 F.R.D. 231, 240 (N.D. Cal. 2014) (finding named plaintiffs' claims were typical

19  where they "ha[d] a similar injury as the rest of the proposed class, since they purchased products

20  that are the same as, or very similar to, the products challenged by the rest of the proposed class"

21  and "[t]heir claims [we]re not based on any conduct that is unique to them.").  Plaintiffs therefore

22  meet Rule 23(a)(3)'s typicality requirement.

23  **5.    Commonality**

24  Rule 23(a)(3) requires that there be "questions of law or fact common to the class."  Fed.

25  R. Civ. P. 23(a)(2).  To satisfy this requirement, the common question must be "capable of class-

26  wide resolution – which means that the determination of its truth or falsity will resolve an issue

27  that is central to the validity of each of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*,

28

United States District Court
Northern District of California

564 U.S. 338, 350 (2011).  "[F]or purposes of Rule 23(a)(2)[,] even a single common question will do."  *Id.* at 359 (internal quotations and modifications omitted).  The Ninth Circuit has explained:

> The requirements of Rule 23(a)(2) have "been construed permissively," and "[a]ll questions of fact and law need not be common to satisfy the rule."  However, it is insufficient to merely allege any common question, for example, "Were Plaintiffs passed over for promotion?"  Instead, they must pose a question that "will produce a common answer to the crucial question why was I disfavored."

*Ellis*, 657 F.3d at 981 (quoting *Dukes*, 564 U.S. at 350).

Plaintiffs argue that they meet the commonality requirement of Rule 23(a)(2).  ECF 62-1 at 20.  They contend that "all the Class Products' cartons have, by definition, borne the same *Pasture Raised* claim."  *Id.*  They claim "[t]his common exposure to a product's packaging suffices to show commonality."  *Id.*  In its opposition, The Happy Group does not expressly dispute that there are questions of law or fact common to the class, opting instead to address it "jointly under predominance" because the two are interrelated.  ECF 70-3 at 12.  The Court will therefore address commonality in conjunction with predominance below.

### 6.    Predominance

Plaintiffs seek class certification under Rule 23(b)(3), *see* ECF 62-1 at 21, which requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members . . . ."  *See* Fed. R. Civ. P. 23(b)(3).  "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.' "  *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted).  "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues."  *Id.* (internal quotations and citations omitted).  "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members."  *Id.* (internal

United States District Court
Northern District of California

17

1   quotations and citations omitted). "Considering whether 'questions of law or fact common to

2   class members predominate' begins, of course, with the elements of the underlying cause of

3   action." *Erica P. John Fund, Inc., v. Halliburton Co.*, 563 U.S. 804, 809 (2011).

4        Here, Plaintiffs assert claims under the CLRA, FAL, UCL, and Sections 349 and 350 of

5   the New York GBL, for breach of express warranty under New York and California law, and

6   intentional misrepresentation.[8]  *See Id.* ¶¶ 65-69, ¶¶ 70-76, ¶¶ 77-85, ¶¶ 86-96, ¶¶ 97-105, ¶¶ 106-

7   115, ¶¶ 123-129.

8        The claims under the CLRA, FAL, UCL, and GBL are governed by the same objective test

9   – the reasonable consumer test – which requires the plaintiff to show that members of the public

10  are likely to be deceived.  *See Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480 (C.D.

11  Cal. 2012) ("California's UCL, FAL and CLRA rely on the same objective test, that is, whether

12  members of the public are likely to be deceived.") (internal quotations and citations omitted);

13  *Zaragoza v. Apple Inc.*, No. 18-CV-06139-PJH, 2019 WL 1171161, at *3 (N.D. Cal. Mar. 13,

14  2019) ("A 'reasonable consumer' test also applies to the N.Y. G.B.L. claims.").

                                a.   <u>Deception</u>

16       Seeking to establish that consumer deception is a common issue that predominates,

17  Plaintiffs point to Dr. Morris's opinion that "reasonable consumers are deceived by the *Pasture*

18  *Raised* claim because it is objectively false under industry standards," an opinion they claim is

19  validated by Dr. J. Michael Dennis's consumer perception survey.  ECF 62-1 at 26.  Dr. Dennis

20  has designed and conducted "surveys about the opinions, perceptions, attitudes, preferences, and

21  values of consumers, voters, members of associations and citizens" for over 25 years.  *Id.* ¶ 6.  In

22  this case, he designed and conducted a "consumer perception survey to determine whether a

23  reasonable consumer was misled by the Defendant's labeling of the Products based on the

United States District Court
Northern District of California

---

[8] Plaintiffs do not meaningfully address their New York claims for breach of express warranty claim and intentional misrepresentation.  Because Plaintiffs bear the burden on class certification and have failed to proffer any developed argument with respect to these claims, the motion for class certification is **DENIED** as to the New York express warranty claim and the New York intentional misrepresentation claim.

United States District Court
Northern District of California

Challenged Representation.[9]" *Id.* ¶ 21.

After implementing a screening protocol to select a representative sample of consumers, Dr. Dennis surveyed adults in California and New York "who reported purchasing a Happy Egg product in the past 12 months or otherwise indicated that they would consider purchasing a Happy Egg product in the next 12 months for personal use." *Id.* ¶¶ 29, 30. Respondents were put into one of two groups. *Id.* ¶ 57. Respondents who were shown a product without the Challenged Representation comprised the Control Group. *Id.* Respondents who were shown an identical product with the Challenged Representation comprised the Test Group. *Id.* The survey results showed that "88.8% of respondents shown the packaging with the Challenged Representation understood the product packaging to be communicating "the[y] are pasture-raised eggs," compared to 11.5% of respondents in the Control Group who perceived the eggs to be pasture raised. *Id.* ¶ 73 (internal modifications omitted). According to Dr. Dennis, "[b]y adding the Challenged Representation to the product packaging, the net increase in consumers' perceptions was 77.4 percentage points (a factor of 7.7) such that a substantial majority of respondents perceived the Products to be "pasture-raised eggs." *Id.* Based on these results, Dr. Dennis opines "that a reasonable consumer perceived the Challenged Representation to convey that the Products are pasture raised eggs." *Id.* ¶ 24.

Relying on the opinions of its own survey expert, Hal Poret, The Happy Group argues that Dr. Dennis's survey fails to demonstrate deception on a classwide basis for two reasons. ECF 70-3 at 21. First, the survey says nothing about how a reasonable consumer might perceive "pasture raised" or whether the term is used consistent with AHA or HFAC standards Plaintiffs claims are the industry standard. *Id.* Second, Dr. Dennis disregarded basic principles of survey design in three ways. *Id.* He did not ask any open-ended questions, such as asking each respondent what pasture raised means to them. *Id.* He asked leading questions, i.e., showing respondents the claim and prompting the answer. *Id.* He also did not include an appropriate control. *Id.*

The Happy Group offers the competing opinion of Mr. Poret to show that there is no

---

9  The Challenged Representation is "the statement 'Pasture Raised on Over 8 Acres.' " ECF 61-88 ¶ 17.

1    classwide deception.  ECF 70-3 at 26.  Based on the results of his own consumer perception

2    survey, Mr. Poret opines that:  "The term 'pasture raised' on the Happy Egg packaging does not

3    cause consumers to believe that the product meets the alleged standard for 'pasture raised' . . . or

4    that the product is certified by AHA or HFAC to meet its standard for 'pasture raised.' "  ECF 74-

5    7 at 6.  Mr. Poret also opines that "the large majority (roughly 85%) of consumers do not

6    understand 'pasture raised' to be a higher standard than 'free range.' "  *Id.* at 7.

7         The Court is not persuaded by Mr. Poret's opinion because it does not align with Plaintiffs'

8    theory of liability.  In their reply brief, Plaintiffs provided clarity on that:

9         Plaintiffs' theory of liability is that pasture raised eggs have an
          objective definition under the Hen Welfare Standards (i.e., the
10        industry standards), and accordingly, the Pasture Raised claim
          deceived consumers.[10]  Therefore, the salient analysis is whether
11        the Hen Welfare Standards are the industry standard, and whether
          the reasonable consumer believes the Class Products are pasture
12        raised eggs.

13   ECF 78-1 at 9.[11]  As phrased, Plaintiffs' theory depends on the existence of an industry standard.

14   As a result, even if Dr. Dennis's survey was properly designed to measure deception, it lacks the

15   needed component from Dr. Morris, whose opinion as to industry standards has been stricken.

16        Plaintiffs' argument that survey evidence is not required to show deception does not help

17   them here.  Their "theory of liability is that pasture raised eggs have an objective definition under

18   the Hen Welfare Standards (i.e., the industry standards), and accordingly, the Pasture Raised claim

19   deceived consumers."  ECF 78-1 at 9.  Plaintiffs' framing of their theory of liability distinguishes

20   this case from those on which Plaintiffs rely.  For example, in *Hadley v. Kellogg Sales Company*,

21   "the falsity or deceptiveness of the challenged health statements on the products at issue w[ere to]

22   be determined based solely on whether the health statements are likely to deceive or mislead a

23   hypothetical reasonable consumer in light of the amount of added sugar that Kellogg put[] into

24   _____

25   [10] In their opening brief, however, Plaintiffs stated: "The salient question is whether consumers
     reasonably believed, based on the *Pasture Raised* claim, that the Class Products were pasture
26   raised eggs.  Because there is no protection for literal falseness, Plaintiffs need only prove the
     falsity of the *Pasture Raised* claim."  ECF 62-1 at 24.

27   [11] Plaintiffs reiterated that clarification at the hearing, stating that the Court would have to accept
     their expert's opinion of the industry standard and confirming they are advancing a theory that
28   hinges on an industry standard.

United States District Court
Northern District of California

United States District Court
Northern District of California

those product[s]." The plaintiffs' theory in that case did not, as here, turn on whether the statements were likely to deceive or mislead based on a purported industry standard. *See id.* Similarly, in *Mullins v. Premier Nutrition Corporation*, no industry standard was at issue. No. 13-CV-01271-RS, 2016 WL 1535057, at *5 (N.D. Cal. Apr. 15, 2016). There, the defendant expressly advertised its produced as "a way to improve joint health." *Id.* The court found that resolving the question of whether an ordinary consumer would reasonably believe this statement was capable of common proof in the form of reviewing advertisements, labels, and then asking the jury how they understood the message. *Id.* It rejected the argument that consumer survey evidence was necessary to satisfy predominance as to consumer understanding. *Id.* Unlike in these cases, Plaintiffs here tether their theory of liability to an industry standard. Because that industry standard anchors their theory of deception, the failure to provide survey evidence measuring deception by reference to that industry standard precludes a finding of predominance. *See Jones v. ConAgra Foods, Inc.*, No. C 12-01633 CRB, 2014 WL 2702726, at *15 (N.D. Cal. June 13, 2014) (finding that individualized issues predominated where the word "natural" had no fixed meaning and expert's opinion did not amount to more than *ipse dixit*).

### b.  Materiality

"For purposes of class certification, the UCL, FAL, and CLRA are materially indistinguishable." *Forcellati v. Hyland's, Inc.*, No. CV 12-1983-GHK MRWX, 2014 WL 1410264, at *9 (C.D. Cal. Apr. 9, 2014). "The objective test for materiality and thus reliance 'renders claims under the UCL, FAL, and CLRA ideal for class certification because they will not require the court to investigate class members' individual interaction with the product.' " *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 410 (S.D.N.Y. 2015) (quoting *Tait*, 289 F.R.D. at 480). Sections 349 and 350 of the New York GBL do not "require proof that a consumer actually relied on the misrepresentation." *Hasemann v. Gerber Products Co.*, 331 F.R.D. 239, 257 (E.D.N.Y. 2019) (citations and footnote omitted). California warranty claims likewise require no such showing.[12]  *See Weinstat v. Dentsply Int'l, Inc.*, 180 Cal. App. 4th 1213, 1227 (2010); *In re Scotts*

---

[12] In contrast, New York express warranty claims do require a showing of reliance. *See In re Scotts EZ Seed Litig.*, 304 F.R.D. at 410 ("[U]nlike the New York and California statutory

*EZ Seed Litig.*, 304 F.R.D. at 411 ("Because reliance is not an element of express warranty claims under California law, common questions predominate and class action treatment is appropriate."). For common law fraud, reliance may be presumed if the defendant's misrepresentations or omissions were material. *See Vasquez v. Superior Court*, 4 Cal. 3d 800, 814 (1971). "A misrepresentation is judged to be 'material' if a reasonable [person] would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 332 (2011) (internal quotations and citations omitted).

Here, the record is sufficiently developed with ample common evidence of materiality. For example, ███████████████████████████████████████████████ ███████████████████████████████████████ ECF 62-54 at 3. The Happy Group's former CEO also testified that pasture raised eggs are generally more expensive that free range or cage free eggs. ECF 62-5 at 55.

In addition to the internal documents and deposition testimony, Plaintiffs offer an additional survey from Dr. Dennis. ECF 62-1 at 28. Focusing his second survey on materiality instead of consumer perception, Dr. Dennis used the "referendum question format" to "measure any materiality attributable to the Challenged Representation." ECF 61-88 at 26. According to Dr. Dennis, this format "measures consumers' preference to purchase either the Products (i) without the Challenged Representation or (ii) with the Challenged Representation." *Id.* Dr. Dennis describes his findings as follows:

> When shown two identical products, one with the Challenged Representation and the other without it, respondents were 8.1 times more likely to state a purchase preference for the Products with the Challenged Representation than without it – i.e., by a margin of 86.9% to 10.7%, consumers prefer to purchase the Products with the Challenged Representation.

*Id.* at 29.

The Happy Group argues that Plaintiffs cannot rely on Dr. Dennis's survey because it

claims . . . , New York warranty claims require proof of reliance.").

United States District Court
Northern District of California

focuses on "preference," which is not materiality.  ECF 70-3 at 27.  That criticism is not well-taken in light of the numerous decisions accepting Dr. Dennis's preference-focused surveys.  *See, e.g.*, *Vizcarra v. Unilever United States, Inc.*, No. 4:20-CV-02777 YGR, 2023 WL 2364736, at *13 (N.D. Cal. Feb. 24, 2023) (accepting Dr. Dennis's revised materiality survey, which tested the effect of the defendant's representations about vanilla flavor derived exclusively from the vanilla plant); *Fitzhenry-Russell*, 326 F.R.D. at 612 (rejecting challenges to referendum battery seeking to prove the materiality of the claim "Made From Real Ginger").

Based on the internal documents Plaintiffs cite, the deposition testimony discussed above, and Dr. Dennis's findings, the Court finds that materiality is a common question that predominates.  *Vizcarra*, 2023 WL 2364736, at *18 (predominance requirement satisfied with respect to claims under UCL, FAL, and CLRA where plaintiffs provided common proof of materiality).

c.    <u>Damages</u>

To satisfy Rule 23(b)(3)'s predominance requirement, Plaintiffs must present a damages model that is "consistent with [their] liability case."  *Comcast*, 569 U.S. at 35 (internal quotations omitted).  Plaintiffs' "model purporting to serve as evidence of damages in this class action must measure only those damages attributable to [The Happy Group's conduct]."  *Id.*  At this stage, however, "[c]alculations need not be exact."  *Id.* (citation omitted).

Here, Plaintiffs seek to recover the "price premium" paid by consumers who purchased the Class Products bearing the Pasture Raised claim.  This measure of damages is appropriate in cases asserting false advertising claims.  *See In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 131 (2009) ("The difference between what the plaintiff paid and the value of what the plaintiff received is a proper measure of restitution in UCL cases.") (citation omitted); *Brazil v. Dole Packaged Foods, LLC*, No. 12-CV-01831-LHK, 2014 WL 5794873, at *5 (N.D. Cal. Nov. 6, 2014) (price premium was appropriate measure of recovery for product mislabeling claims asserted under the UCL, FAL, and CLRA); *Hasemann*, 331 F.R.D. at 275 (price premium was an appropriate measure of damages under New York's General Business Law §§ 349 and 350).

///

United States District Court
Northern District of California

United States District Court
Northern District of California

1    In support of their price premium theory of damages, Plaintiffs rely on their proposed

2    expert, Colin Weir.  ECF 62-1 at 29.  Weir offers two methodologies to calculate price premium

3    damages.[13]  ECF 62-67 ¶ 16.  First, Weir describes a conjoint analysis as "a representative survey

4    technique that permits an economist to analyze the value of various product attributes" and "can

5    be used to determine market valuation/attribute information for a given product or attribute."  *Id.*

6    ¶ 18.  He explains that "[i]n a typical conjoint analysis, survey panelists are confronted with

7    various choices of product attributes, prices, and other alternatives, and asked either to rank their

8    preferences, or to choose the most preferred attribute or combination thereof."  *Id.* ¶ 20.

9    According to Weir, "[t]hrough conjoint analysis, by systematically varying the attributes of the

10    product and observing how respondents react to the resulting product profiles, one can statistically

11    measure information about the individual attributes."  *Id.* ¶ 21.  Then, "[s]tatistical methods

12    (including regression analysis) are . . . applied to the survey responses to calculate attribute value."

13    *Id.* ¶ 22.  Weir states that "as a survey tool," conjoint analysis "does not rely on an existing data

14    set for its analysis because it relies on data generated through the survey process.  Common

15    conjoint analysis software permits the administration of a representative sample survey, and the

16    analysis of the results therefrom."  *Id.* ¶ 32.  As a result, "[n]o individualized analyses, or Class-

17    Member-specific inquiry will be required."  *Id.* ¶ 33.

18    In his declaration, Weir outlines a proposed conjoint survey design in which a sample of

19    respondents will answer screening questions, receive a series of instructions about assumptions

20    and attributes, then complete "choice-based conjoint choice tasks."  *Id.* ¶¶ 41-56.  Weir asserts that

21    he can use software to analyze the survey results and run a market simulation to measure the price

22    premium on a classwide basis.  *Id.* ¶¶ 57-74.

23    Second, Weir proposes hedonic regression as a methodology to calculate price premium

24    damages.  *Id.* ¶ 90.  He explains that "[h]edonic regression is an application of standard regression

25    techniques that measure the value of various product attributes.  Hedonic regression is based on

26

27    _____

28    [13] Weir defines price premium damages as "the portion of the market price of the Products solely attributable to Defendant's misrepresentation (i.e., the Claim), or in other words, the difference in market value between what was promised, and what was delivered."  ECF 62-67 ¶ 17.

the concept that each product attribute has a different and measurable impact on aggregate consumer utility." *Id.* ¶ 91.

The Happy Group attacks Weir's proposed methodologies on three grounds. ECF 70-3 at 28. First, The Happy Group argues that Weir "does not propose to test the price premium associated with being certified." ECF 70-3 at 28. Second, it contends that Weir's hedonic regression model cannot, as he claims, control for "any given claim." *Id.* Specifically, Weir did not review the data sets his model relies on, which Weir admitted do not include any information on "Pasture Raised on Over 8 Acres" or "Pasture Raised."[14] *Id.* The Happy Group argues that this makes Weir's proposed hedonic regression model "impossible because he cannot test that claim as a variable." *Id.* Third, The Happy Group faults Weir for ignoring supply side factors. *Id.*

As to the first argument, Plaintiffs seek to recoup the price premium The Happy Group received by selling the Class Products as "pasture raised" when they allegedly were not. Plaintiffs explain that Weir's model seeks to quantify that price premium under their theory of liability on a classwide basis. *See* ECF 78-2 at 19-20; ECF 62-67 ¶ 118 (defining price premium damages as "the difference between the market value (purchase price) of the Products (with the Claim[15]) and the market value of the Products (without the Claim), at the time and point of sale" and explaining that calculating that price premium can be done on a classwide basis). The Court agrees that Weir's damages model is thus adequately tailored to Plaintiffs' theory of liability, and as such, it satisfies *Comcast*. *See Prescott*, 2022 WL 3018145, at *11 (finding price premium damages model "firmly tethered" to the plaintiffs' theory of liability where they sought they sought "to recover the price premium they paid for the color renew/revive feature promised on the Woolite labels.").

The Happy Group's remaining criticisms of Weir's methodology are proper subjects for a later stage. *See Lytle*, 2024 WL 3915361, at *14 (stating that, on remand, the defendant "must be

---

[14] The Happy Group claims that the data also "does not distinguish between the words 'Pasture Raised' on the carton versus a certification by AHA or HFAC." ECF 70-3 at 28.

[15] Weir defines the "Claim" as "Pasture Raised on Over 8 Acres." ECF 61-89 ¶ 8.

United States District Court
Northern District of California

given the opportunity in advance of trial to test the sufficiency and reliability of [the expert's] . . . model once it has been fully executed, including through a motion for summary judgment and/or a renewed *Daubert* motion.").  At class certification, "Plaintiffs need only show that such damages can be determined without excessive difficulty and attributed to their theory of liability, and [they] have proposed as much here." *See Just Film, Inc. v. Buono*, 847 F.3d 1108, 1121 (9th Cir. 2017).  "A plaintiff is not required to actually execute a proposed conjoint analysis to show that damages are capable of determination on a class-wide basis with common proof." *Bailey*, 338 F.R.D. at 408 n.14 (citation omitted); *see also Lytle*, 2024 WL 3915361, at *12 ("Plaintiffs may rely on an unexecuted damages model to demonstrate that damages are susceptible to common proof.").  Thus, The Happy Group's contention that "Plaintiffs fail[ed] to carry their burden because Weir did not execute any models to show a price premium" and that "the only market evidence is that Happy Egg [*sic*] sells for less than AHA or HFAC certified pasture raised producers" are not persuasive at this stage.  *See Lytle*, 2024 WL 3915361, at *13 (stating that "conjoint analysis is a well-accepted technique that is frequently used to establish damages in CLRA actions").  In line with these authorities, the Court also rejects The Happy Group's additional argument that Plaintiffs must establish that a price premium exists for their GBL claim, even if they do not prove the exact amount.  Having considered all of the above, the Court finds that Plaintiffs have put forth a theory of damages that aligns with their theory of liability.

## III.    CONCLUSION

For the reasons set forth above, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motion for class certification and **GRANTS** Defendant's motion to strike.  To the extent any party seeks to maintain any portion of this order under seal, the parties shall meet and confer and submit joint proposed redactions, by way of an administrative motion to seal in compliance with Civil Local Rule 79-5, by no later than October 11, 2024.  In the interim, this order will remain provisionally under seal in its entirety.  If no proposed redactions are received by 11:59 p.m. on October 11, 2024, the Court will unseal this order in full.

///

///

The Court sets a case management conference for December 12, 2024 at 10:00 a.m.  The parties shall file a further case management conference statement, compliant with Civil Local Rule 16-10(d), by no later than noon on December 5, 2024.

**IT IS SO ORDERED.**

Dated: September 27, 2024

_____
**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**

United States District Court
Northern District of California